(C. D. 1162)

CHARLES R. ALLEN, INC., ET AL. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 2, 1949)

*John F. Kavanagh* for the plaintiffs.
*David N. Edelstein,* Assistant Attorney General (*Michael Stramiello, Jr.,* special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

CLINE, Judge: These are protests against the collector's assessment of duty on coconut meat at 35 per centum ad valorem, less the Cuban preferential of 20 per centum, under paragraph 761 of the Tariff Act of 1930, as "Edible nuts * * * otherwise prepared or

preserved, and not specially provided for." All of the protests involved herein were consolidated at the trial.

The original protests claim (1) that the merchandise is dutiable at 3½ cents per pound under paragraph 758, as "coconut meat, shredded and desiccated, or similarly prepared," less the Cuban preferential of 20 per centum, and (2) that it is free of duty by reason of Public Law 504 (58 Stat. 817, T. D. 51173).

At the trial counsel for the plaintiffs moved to amend the protests to include the following claims: (1) That if the merchandise is not dutiable directly under paragraph 758, it is dutiable thereunder by virtue of the similitude provisions contained in paragraph 1559; (2) that if it is not free of duty under paragraph 758, it is dutiable at 10 per centum or 20 per centum under paragraph 1558, less the Cuban preferential of 20 per centum; (3) that it is dutiable under paragraph 506 at 20 per centum, less the Cuban preferential of 20 per centum; (4) that it is entitled to free entry by virtue of the Cuban Reciprocity Treaty (T. D. 47232) in effect at the time of importation and by virtue of the intent of Congress in enacting Public Law 504 (58 Stat. 817, T. D. 51173); (5) that the collector should have classified the merchandise under the general rule that an *eo nomine* tariff provision for an article includes all forms of that article; (6) that if it is dutiable under paragraph 761, duty should apply only to the coconut meat.

When the amendments were first offered at the hearing at West Palm Beach, counsel for the Government objected to a clause appearing in both the original protests and the amendments on the ground that it is uncertain as to meaning. Said clause reads:

Each of the claims herein made is made only conditionally and with the proviso that the rate claimed is lower than the rate assessed.

Decision on the granting of the motions to amend the protests was reserved for the full division.

The proposed amendments cover the same merchandise as that involved in the original protests and are therefore permissible. *United States* v. *Macksoud Importing Co.*, 25 C. C. P. A. 44, T. D. 49041. Defendant's objection applies as much to the original protests as to the amendments. A protest is sufficient if it distinctly and specifically sets forth the reasons for the importer's objection to the liquidation by the collector. *Raybestos Manhattan, Inc.* v. *United States*, 27 C. C. P. A. 340, 350, C. A. D. 109. The grounds of plaintiffs' claims are clearly set forth in the protests and the proposed amendments; the effect of the proviso, if any, need not now be passed upon. The motions to amend the protests are granted.

The claims under paragraphs 506 and 1558 have been abandoned by the plaintiffs. The pertinent provisions of the statutes are therefore the following:

TARIFF ACT OF 1930:

PAR. 761. Edible nuts, not specially provided for, * * * pickled, or otherwise prepared or preserved, and not specially provided for, 35 per centum ad valorem; * * *.

PAR. 758. Coconuts, one-half of 1 cent each; coconut meat, shredded and desiccated, or similarly prepared, 3½ cents per pound.

PAR. 1559. That each and every imported article, not enumerated in this Act, which is similar, either in material, quality, texture, or the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars before mentioned; * * *.

PUBLIC LAW 504 (58 STAT. 817, T. D. 51173):

* * * That no duty shall be levied, collected, or payable under the Tariff Act of 1930, as amended, with respect to coconuts or coconut meat provided for in paragraph 758 of that Act, entered, or withdrawn from warehouse, for consumption, during the period beginning with the day following the date of enactment of this Act and ending with the termination of the unlimited national emergency proclaimed by the President on May 27, 1941.

CUBAN RECIPROCAL TREATY (T. D. 47232):

*        *        *        *        *        *        *

The President of the United States of America and the President of the Republic of Cuba, desirous of strengthening the traditional bonds of friendship and commerce between their respective countries by maintaining as the basis for their commercial relations the granting of reciprocal preferential treatment, * * *:

*        *        *        *        *        *        *

ARTICLE XIV

Laws, regulations of administrative authorities, and decisions of administrative or judicial authorities, pertaining to the classification of articles for customs purposes and to rates of duty shall be published promptly in such a manner as to enable traders to become acquainted with them. * * *

At the trial the plaintiffs called 17 witnesses: (a) The four managing heads of the plaintiff firms: Charles R. Allen, importing under the name of Charles R. Allen, a partnership, and Charles R. Allen, Inc.; Thomas Wells Holt, a partner of T. W. Holt & Co. and president of Holt Trading Co., Inc.; A. Albert Green, secretary of Green Brothers, Inc.; and J. W. Richardson, a partner of Ricco Products Co. (b) Four manufacturers of coconut meat: Sixto Ferro, manager and one of the owners of Industrias Ferro, manufacturer of a portion of the imported merchandise; Antonio Teijeiro Fernandez, manufacturer of another part of the imported merchandise; Chaim Schoenfeld, president of Overseas Trading Co., a manufacturer of coconut meat in Cuba; and M. H. White, half-owner and general manager of a coconut meat plant in Miami. (c) Two bakers: William M. Wolfarth, president and general manager of Cushman Baking Co., a Florida corporation; and G. Hernandez, a retail baker. (d) A candy manufacturer, J. S. Howard, Jr., owner and general manager of De Soto Candy Co.

(e) Six housewives: Mrs. Stuart Gordon, Mrs. A. R. Hester, Mrs. W. H. Lamb, Mrs. Eugene Favata, Mrs. Fred H. Czerner, and Mrs. B. B. Burnes.

It appears from an examination of the official papers herein that the merchandise was exported from Cuba by two firms, Teijeiro y Compania S. en C., and Industrias Ferro, S. A., on various dates between April 12, 1945, and March 2, 1947; that the Teijeiro product is described as "coconut in syrup" and the Ferro product is described as "grated coconut in light syrup, 'Ferro Brand' "; that the merchandise was shipped in several different-sized cans (13 ounces; 2 pounds; and 6 pounds, 8 ounces); that the cans contained varying amounts of sugar.

As to the sugar content, the record establishes through the testimony of the witnesses Allen, Richardson, Schoenfeld, and Ferro that some shipments contained as high as 65 per centum sugar; that from 1942 to 1945 they generally contained 39 per centum sugar; that the United States Government through the Department of Agriculture controlled the amount of sugar permitted in imported products; that after 1945, the permissible amount was reduced to 16⅔ per centum.

The record also establishes that prior to World War II over 90 per centum of the desiccated coconut which was imported into the United States came from the Philippines; that this source of supply was cut off when the Japanese took over the Islands; that canned coconut meat in syrup began to be produced in Cuba and exported to the United States; that small quantities arrived in mid-1943 and larger quantities in 1945, 1946, and 1944; that in 1944, 90 per centum of the coconut meat exported from Cuba was in the canned form and 10 per centum or less in the dry form; that the Cuban product was put up in the canned form because of a lack of practical knowledge and proper equipment for dehydrating and a shortage of tinfoil in which properly to pack the dried product; that the dried coconut meat produced in Cuba was found by importers to be inferior and would not keep; that although one witness, Thomas Wells Holt, testified that he had no trouble with Cuban desiccated coconut imported from September to November 1946, he thought that improvements in the method of desiccating had been made, since the product he saw in Cuba in 1943 was very inferior.

The method of production of the Ferro product was described by the witnesses Allen, Holt, and Green, who had visited the factory, and by Mr. Ferro himself. Their testimony may be summarized as follows: As a first step the shells of the coconut are removed, the inner brown skin buffed off, and the meat broken into pieces. The pieces are placed in a rolling machine which has two rolls and teeth of one size and two more rolls and finer teeth. The resultant shredded

or grated coconut meat is weighed and added to a mixture of sugar and water and is cooked for about 35 minutes at a temperature of 200 degrees Fahrenheit. The product is placed in cans which are hermetically sealed, cooked for 40 minutes, and then cooled to room temperature.

Antonio Teijeiro Fernandez, manufacturer of a portion of the merchandise involved herein, described his method of production as follows: After the coconuts are received, the hulls are taken off and the small brown cover is removed by a knife. Then the coconut meat is broken, the milk removed, and the pieces washed. The pieces are put on a revolving machine which has two teeth that bite into the coconut and shred it. The shredded coconut is then put into a double steam boiler and mixed with sugar and water and cooked. About 1 pound of sugar is added to 5½ pounds of water and coconut, consisting of 40 per centum water and 60 per centum coconut.

Mr. Schoenfeld, another manufacturer, testified that in producing his product, first the shell of the coconut is removed, the brown skin buffed off, and the meat cut and washed; that the pieces are put through either a shredder or a grater; that the shredding machine contains interlocking revolving knives which cut the coconut meat into short or long shreds; that the grating machine has revolving teeth and cuts the meat into very fine particles; that the shredded or the grated coconut is added to a sirup of sugar and water and cooked in a pail.

Several witnesses described the process of manufacturing dried coconut meat. Mr. Allen stated that the process is the same as in manufacturing the canned product up to the point of adding the sugar and water; that, instead, the coconut meat is placed in a centrifugal machine that dehydrates. Mr. Holt stated that two methods are used in Cuba; that in one, the drier is a large cylinder and the coconut is agitated in it, and in the other, the drier is more of an oven; that coconut which has been immersed in sugar sirup for a certain time is placed in the drier and the moisture taken out.

Mr. Green described the method of producing coconut meat in dry form as follows: First, the fresh nuts are brought in and spread on the floor; then they are opened by hand; then the meat is removed from the shell with a paring knife. The meat is put into a container like a bucket and taken to a shredding machine where it is cut up into small pieces. Then the coconut oil is pressed out in order to reduce the moisture content. The remaining meat is placed on a pan and brought to a heating chamber where it is cooked or baked at 200 degrees for about 30 or 40 minutes until the moisture is cooked out. In the particular process he observed no sugar was added.

Mr. White, general manager of a desiccated coconut plant in Miami, testified that in his factory the coconut first goes through an automatic circular saw, cutting it in two; then it is conveyed into a steam box where it is steamed for 15 or 20 minutes, after which it is laid on a table which has a series of air jets which are used to extract the meat from the shell. The meat is next conveyed to a paring machine which removes the thin brown skin and then to a grinding machine equipped with knives where it is ground into shreds about a quarter of an inch long. To manufacture sweetened dehydrated coconut, 200 pounds of ground coconut meat are placed in a rotary kettle together with 100 pounds of dry sugar; the kettle rotates for about 80 minutes during which time the moisture leaves the coconut to such extent that 200 pounds of sweetened coconut result. To make the unsweetened variety, the ground coconut meat is placed in a dehydrator which takes the moisture out to such an extent that it is not necessary to add sugar as a preservative.

Mr. Schoenfeld testified that the initial processes in manufacturing dried coconut are the same as those employed in making canned coconut; that after the coconut meat has been shredded or grated, the oil is pressed out; that the meat is then mixed with sugar and put in a dehydrating steam chamber; that after it is dried, it is again mixed with sugar and put into a kettle and boiled to a certain degree.

The witnesses brought out the following differences and similarities between the canned coconut meat and the dried product. Practically all of the witnesses testified that the two could be used interchangeably for most purposes, but Mr. Hernandez stated that the canned form is never used for sprinkling on the top of pies and cakes; that it could not be used for this purpose unless the pastry was put in the oven and toasted and then it would have a different taste. Mr. Wolfarth testified that the dried form requires the addition of moisture to restore it to its usable state, whereas the canned form has to have the moisture drained off. Mr. Howard testified that in the manufacture of candy not as much sirup would be added when the canned form was used, since the candy mixture requires 30 per centum coconut regardless of which form is used and not as much coconut is obtained from the same cubic content of the canned as from the dried product.

A number of the witnesses testified that the canned form had more of a coconut flavor. Mr. Ferro gave as a reason the fact that the coconut oil is pressed out of the dried form.

As to deterioration, Mr. Wolfarth stated that the dried form is like sawdust and is good for any period of time, while the canned must be used as soon as the can is opened. On the other hand, Mr. Howard testified that the canned would keep for years, if unopened, while the dried would keep only 3 or 4 months.

Both types are sold to the same classes of customers—wholesale grocers, wholesale chains, bakers, candy manufacturers, and hotel, bakery, candy, and ice-cream supply firms—and both forms are used by such customers for the same purposes. Some of the uses of the merchandise are as follows: In making pies and cakes, frosting, cookies, ice-cream topping, coconut ice cream, coconut candy, in fruit salad, over fresh fruits, and as a sprinkle. Mrs. Favata testified that she used the canned form when she wanted a moist-flavored cake and the dry for topping and between layers.

The plaintiffs claim that the merchandise does not come within the provisions of paragraph 761 for edible nuts, prepared or preserved, but belongs under paragraph 758, by reason of the *eo nomine* provision for coconut meat or by similitude under paragraph 1559, or by virtue of Public Law 504. The Government claims that the evidence does not overcome the presumption of correctness attaching to the collector's classification; that it does not sustain plaintiffs' claims that the merchandise should be classified under paragraph 758; and that the decision in *The East Asiatic Co., Inc.* v. *United States*, 20 Cust. Ct. 219, C. D. 1111, rehearing denied, Abstract 52457, is controlling.

In *The East Asiatic Co., Inc.* v. *United States, supra,* it was held that coconut meat which had been shredded or grated into small pieces and packed in tins in sugar sirup did not fall within the provisions of paragraph 758 for "coconut meat, shredded and desiccated, or similarly prepared." However, in that case there was no evidence as to the method of preparation of the merchandise and very little as to its use. The court stated:

> In view of our finding that the merchandise at bar has not been shown to be similarly prepared to coconut meat which has been shredded and desiccated, we hold that the plaintiff has failed to sustain the burden of overcoming the presumption of correctness attaching to the collector's classification of this commodity as "Edible nuts, * * * pickled, or otherwise prepared or preserved, and not specially provided for, * * *" dutiable at 35 per centum ad valorem under paragraph 761 of the Tariff Act of 1930, less the 20 per centum Cuban preferential.

Since the omissions in that case have been supplied in the instant case, we believe the question should be fully reconsidered on its merits.

The principal issue is whether or not this form of coconut meat is included within the provision in paragraph 758 for "coconut meat, shredded and desiccated, or similarly prepared." In order to determine what Congress meant by this provision, it is pertinent to examine the legislative history of tariff provisions for coconuts and for nuts, not specially provided for. This study reveals some interesting facts. For instance, coconuts have been mentioned specifically, whether free or dutiable, since 1832. In the acts of 1864 and 1870, coconuts were listed in the same paragraphs as lemons, oranges, and

other fruits. In the acts of 1883 and 1890, coconuts were placed in the free list. Then in the act of 1894, prepared or desiccated coconut was listed in the fruit schedule in a paragraph which provided for comfits, sweetmeats, and fruits preserved (paragraph 218), while coconuts in the shell were provided for in the nut schedule under paragraph 224. In the acts of 1897, 1909, and 1913 "coconut meat or copra desiccated, shredded, cut, or similarly prepared," was listed in a paragraph which also provided for orange peel and lemon peel, preserved, candied, or dried, while coconuts in the shell and broken coconut meat or copra were placed on the free list in a paragraph also providing for certain other nuts. This is an indication that when Congress was thinking of "coconuts" as whole coconuts or as broken pieces of copra, they were specially provided for together with other nuts, but that when Congress was thinking of edible coconut meat, it was specially provided for together with fruits or sweetmeats. It cannot be assumed, therefore, that Congress intended that any edible form of coconut meat should be classified as nuts, not specially provided for.

In the Tariff Act of 1922, coconuts and "coconut meat, shredded and desiccated, or similarly prepared" were provided for in the same paragraph [756], but copra remained on the free list [1626]. The Summary of Tariff Information, 1921, gives the following reason for the change (p. 759):

Coconuts have been transferred from the free list (par. 557) of the 1913 act. "Copra" is omitted here because the word is not applied in trade to the shredded meat of the coconut, but is confined to the unshredded meat as oil material, which is covered by paragraph 1620 of H. R. 7456.

Nothing therein indicates an intention on the part of Congress to classify any form of edible coconut meat as nuts, not specially provided for.

It is also to be observed that paragraph 218 of the act of 1894 provided for "prepared or desiccated cocoanut or copra," and the acts of 1897, 1909, and 1913 provided for "coconut meat or copra, desiccated, shredded, cut, or similarly prepared." Under these provisions it was not necessary that the coconut meat be both prepared *and* desiccated, or shredded *and* desiccated; coconut meat which had been desiccated or shredded or cut or prepared would fall thereunder.

In the act of 1922, the language was changed to "shredded *and* desiccated, or similarly prepared." We do not think this change of language evidences a change of intent. In the Summary of Tariff Information, 1921, there is an explanation of the omission of the word "copra," but there is none as to the other changes. In the Summary of Tariff Information, 1929, the heading of page 1331 is "Coconut Meat, Shredded and Desiccated," but the heading of a table on im-

ports on the same page is *"Coconut meat desiccated, shredded, cut, or similarly prepared."*

In *Pacific Vegetable Oil Co.* v. *United States*, 32 C. C. P. A. 68, C. A. D. 287, it was claimed that no cylindrical tank which was not also tubular could be classified under the provision in paragraph 328 of the Tariff Act of 1930 for "cylindrical and tubular tanks or vessels." It appeared that in the acts of 1909 and 1913 the words "cylindrical" and "tubular" had been joined by the conjunction "or" and appellant contended that the change in language implied a change in intent. The court held that throughout the Tariff Act of 1930 the words "and" and "or" were frequently used interchangeably to indicate distinct articles; that from a consideration of the language in paragraph 328 and the predecessor paragraphs in the Tariff Acts of 1909 and 1913, the words "cylindrical and tubular tanks" referred to distinct articles and not to cylindrical tubular tanks alone.

Following this line of reasoning, the provision in paragraph 758 for "coconut meat, shredded and desiccated, or similarly prepared," refers to distinct articles; namely, shredded coconut meat, desiccated coconut meat, and coconut meat similarly prepared. See the indices in *United States Import Duties, June 1946*, and *United States Import Duties (1948)*, prepared by the United States Tariff Commission, which contain the following:

| | Paragraph |
|---|---|
| Coconut: | |
| Meat, shredded, or desiccated, or similarly prepared____ | 758 |

Since the merchandise herein was not desiccated, it must be determined whether it falls within the terms "shredded" or "similarly prepared." The Government contends that the merchandise has been "grated" rather than "shredded." Mr. Ferro testified that his machinery worked the coconut meat into the form of plaintiffs' illustrative exhibit F which had previously been identified by Mr. Schoenfeld as "small shredded coconut" after it had been through a shredding machine. However, he stated that he called his product "grated," but did not know exactly what it was. Mr. Green testified that shredding is a long cut, whereas grating is a medium or a short cut; that the terms grated and shredded are used interchangeably; that the majority of pieces in a package of "Baker's coconut sweetened premium shredded" (defendant's exhibit A for identification) were longer than those in plaintiffs' exhibit 5, the canned product. Similar testimony was given by Mr. Richardson. Mr. Schoenfeld stated that in his plant two different machines were used, one to grate and one to shred; that the shredding machine had interlocking knives and the grater revolving teeth; that the grater made the pieces very fine; that there was not much difference between the two products.

In *W. R. Grace & Co.* v. *United States*, 19 C. C. P. A. 326, T. D. 45482, two types of desiccated coconut meat were involved, "chip sliced" and "fine macaroon." The former consisted of irregularly shaped chips and slices varying from ¼ inch to 2 inches in length cut into these shapes by a machine. It was held that this corresponded to dictionary definitions of the word "shred." The macaroon coconut consisted of the residue left after shredding or cutting which had been ground. It was held that the grinding process following the shredding process might remove the resultant product from being defined as shredded, but it would come within the term "similarly prepared."

In the instant case the grating process is similar to the shredding process and the only difference in the two products is that one is finer than the other. Whether this merchandise is technically "shredded" or "grated," it falls within the terms of paragraph 758.

While the merchandise herein has not been desiccated, it has been prepared by a similar process, and the product is a prepared coconut meat similar to desiccated, shredded coconut meat. Sweetened dried coconut meat is prepared by placing the shredded coconut meat together with dry sugar in a kettle which rotates under steam pressure or by placing it in a dehydrating steam chamber and then in a kettle where it is boiled to a certain degree. The instant merchandise is produced by cooking the coconut meat in a mixture of sugar and water. In one case dry sugar is added to the coconut meat and in the other liquid sugar is so added. In using one product moisture is added and in using the other the surplus liquid is drained off.

The Summary of Tariff Information, 1929, refers to sweetened and unsweetened dried coconut meat (p. 1331). Congress knew, therefore, that there were two varieties of dried coconut meat and there is no indication that it intended to limit the coverage of paragraph 758 to the unsweetened kind. Nor does it appear that coconut meat sweetened by the use of liquid sugar should be excluded. The history of the various provisions for coconut meat set forth above indicate rather that special provision was made for coconut meat in all its forms. Edible coconut meat is covered by paragraph 758 and inedible coconut meat or copra by paragraph 1727.

For these reasons we hold that the coconut meat involved herein is properly classifiable under paragraph 758 as "coconut meat, shredded and desiccated, or similarly prepared" and that by reason of Public Law 504 (58 Stat. 817) the importations herein are entitled to entry free of duty. The protests are sustained and judgment will be rendered in favor of plaintiffs.